**COMMONWEALTH of Pennsylvania,**
**Appellee**

**v.**

**Jon Anthony SPETZER, Appellant.**

Superior Court of Pennsylvania.

Submitted April 27, 1998.

Filed Dec. 17, 1998.

Reargument Denied Feb. 2, 1999.

Ronald McGlaughlin, State College, for appellant.

Stephen P. Sloane, Dist. Atty., Bellefonte, for Com., appellee.

Before KELLY, BROSKY and MONTEMURO*, JJ.

* Retired Justice assigned to the Superior Court.

BROSKY, J.

This is an appeal from a judgment of sentence imposed upon appellant after he was convicted of numerous charges relating to sexual offenses as well as criminal solicitation and intimidation of a witness/victim offenses.

Appellant raises six issues for our consideration which we restate as follows: (1) whether trial counsel was ineffective for, inter alia, failing to object to the admission of confidential communications between appellant and his wife, hearsay testimony and other irrelevant or inadmissible testimony; (2) whether the court erred in failing to suppress the contents of intercepted telephone conversations because admission of them violated the confidentiality privilege; (3) did the sentencing court abuse its discretion in sentencing appellant; (4) did the District Attorney commit prosecutorial misconduct in not turning over a potentially exculpatory letter to appellant's counsel; (5) did the court err in denying appellant's motion to sever and (6) was the evidence sufficient to sustain the conviction as to all attempt and solicitation charges? We reverse in part and remand for a new trial.

The following recitation of the facts is, for the most part, set forth in a light favorable to the Commonwealth as verdict winner. At the time of trial appellant, Jon Spetzer had been married to Kim Spetzer for four years during which Mrs. Spetzer was repeatedly subjected to physical and psychological abuse. In January of 1995, Mrs. Spetzer's twelve year old daughter from a previous relationship, (herein B.G.), who had been living in Kentucky along with Mrs. Spetzer's three other daughters from the prior relationship, came to Pennsylvania for an extended stay with appellant, Mrs. Spetzer and their two children. In April of 1995, B.G. awoke to find appellant fondling her, which he continued to do for several minutes despite her protests. Several days later appellant had forcible intercourse with B.G. after putting a sock in her mouth and threatening to kill her or ruin her life if she ever told anyone. The following two evenings appellant again raped B.G. at knifepoint while reiterating his threats to kill her or ruin her

life if she told anyone. Appellant facilitated the rapes by drugging Kim Spetzer so she would go to sleep at an earlier time.

In May of 1995 Mrs. Spetzer took B.G. and the other children to Kentucky to stay with their biological father. There the victim's father discovered what appellant had done to B.G. after which he took B.G. to Children and Youth Services in Kentucky to report the incidents. Mrs. Spetzer called appellant from Kentucky and told him that she had learned about the rapes. Appellant became angry and insisted that Mrs. Spetzer return to Pennsylvania and that she should tell B.G. to keep her mouth shut.

Mrs. Spetzer remained in Kentucky for several more weeks until appellant arrived by bus and drove her and their two children back to Pennsylvania. While driving home appellant beat Mrs. Spetzer and made verbal threats towards her in addition to forcing her to perform sexual acts. Appellant was first arrested after authorities became aware of another beating of Mrs. Spetzer and was placed in Meadows Psychiatric Hospital. Mrs. Spetzer filed a petition seeking a Protection From Abuse order but did not pursue the matter due to financial pressure imposed by appellant's parents. During visits to see her husband at the hospital appellant made several inculpatory statements to Mrs. Spetzer including descriptions of how he had kept B.G. quiet during the rapes.

Eventually B.G. was brought to Pennsylvania by her father to report the rapes to the Pennsylvania State Police which led to the filing of a criminal complaint on July 14, 1995, charging appellant with various sexual assault charges. The above assaults on B.G. provided the factual basis for the charges leveled in information number 1995–1116.

While in jail and after his eventual release on bail appellant engaged in a course of conduct designed to get the key witnesses against him to recant their allegations. He urged Mrs. Spetzer to recant her story about the rapes and he also told her to have B.G. write a letter to the D.A.'s office saying that she lied. Mrs. Spetzer in fact recanted her statement and tried to get B.G. to write a recantation letter while appellant continued to write to his wife and the victim from jail in order to force a recantation letter to be written. After the pre-trial hearing, appellant returned home despite a court order barring his presence and beat Mrs. Spetzer again. The victim finally wrote a letter of recantation due to continued pressure from appellant and Mrs. Spetzer.

While out on bail appellant urged Mrs. Spetzer to inquire of B.G. and Mrs. Spetzer's oldest daughter whether they had any interest in having a sexual encounter with him and to attempt to set up such an encounter between himself and the girls at a motel. The gist of the plan was that Mrs. Spetzer was supposed to meet the girls, who had been placed in foster care, at a local mall while they were shopping with their foster family and drive them to the appointed destination. After several attempts failed to produce a rendezvous appellant beat his wife in order to compel her to continue to try to set up the meeting.

Fearful that if the contemplated sexual encounter did not materialize appellant might attempt an abduction and rape of the two, Mrs. Spetzer eventually reported appellant's actions to the State Police after which she consented to a tape recording intercept of her phone conversations with appellant. At this point appellant was calling Mrs. Spetzer on a daily, or more frequent, basis and much of their conversations dealt with arranging the sexual encounter. Mrs. Spetzer, now cooperating with the police, played her role as a willing participant in the scheme and suggested to appellant that her daughters might have an interest in meeting him at a hotel for a sexual encounter. Additionally, in response to inquiries from appellant she assured him on several occasions that she was not taping the conversations.

Operating under the assumption that the meeting would take place, appellant arrived at the designated hotel and was subsequently arrested by State Police. In criminal information number 1996–505 appellant was charged with numerous counts of intimidating witnesses, criminal solicitation and criminal attempt.

A jury trial was held in July of 1996 and appellant was found guilty on all counts of

both criminal informations, a total of 56 counts. Numerous post-trial motions were filed including one for appointment of new counsel, which was granted. Appellant's new counsel filed additional post-trial motions which included assertions of ineffective assistance of counsel. After a hearing and arguments on the motions, during which trial counsel was questioned regarding the allegations of ineffectiveness, all claims for relief were denied. This appeal followed.

## I. Confidential Communications

Appellant first asserts that his trial counsel was ineffective for failing to object to the testimony of his wife, Kimberly Spetzer. The testimony of Mrs. Spetzer is replete with communications between appellant and herself. They include, but are not limited to: a statement that appellant got really upset when he discovered that a report had been made to the Kentucky equivalent of CYS and that he stated "you better make sure that kid keeps her mouth shut. You better tell your sister to mind her own business...." (N.T., 7/23/96 p. 75). Mrs. Spetzer's statement to appellant that "I was disgusted. I didn't think I ever wanted him to touch me again." (*Id.*, at 76). Additional statements that Mrs. Spetzer had better make sure her sister and B.G. keep their mouths shut. (*Id.*, at 77). Mrs. Spetzer's statement to appellant that "my whole family was mad at me because I should be reporting it, too, and I haven't yet." (*Id.*, at 78). Mrs. Spetzer's statement to appellant " Jon, I know you raped Brandy," and appellant's response "well it wasn't rape. It was sex.... It really wasn't sex because I didn't get it all the way in." Another statement that "He told me that he had, how he kept her quiet was stuff a sock down her throat, put duct tape over it and he said he really had her scared with a knife." (*Id.*, at 83).

There was an additional statement by Mrs. Spetzer to the following effect: "He told me he raped her five times." A statement by Mrs. Spetzer attributed to appellant, "I told her [B.G.] that if she ever told anybody I was going to kill her." (*Id.*, at 84). Mrs. Spetzer further testified to statements made by appellant relating to an alleged sabotaging of a van. "He said the brake fluid was suppose (sic) to leak very slow so the van would be out of Pennsylvania by the time Leo would have an accident." (*Id.*, at 90). Appellant's statement to wife while he was in jail "you were suppose (sic) to stop all of this before it started." (*Id.*, at 92). "He said there's own (sic) two witnesses. There's you and [B.G.] He said you don't have to testify." (*Id.*, at 92–93). "He said well then you're going to have to go see my lawyer and you're going to have to go tell my lawyer you lied to the police." (*Id.*, at 93). Mrs. Spetzer alleged response to appellant was to the following effect: "I didn't want to at first but I said I would." Mrs. Spetzer's additional comments that appellant told her to have [B.G.] write a letter to the D.A. stating that she had lied about the rapes. (*Id.*, at 94). A statement with respect to Mrs. Spetzer's potential liability for lying to the police: "well you won't get nothing compared to what I'll get for raping [B.G.]" and "they wouldn't put me in jail because I was pregnant." (*Id.*, at 119). Mrs. Spetzer also testified that she told appellant "I'm not going to get a lawyer, Jon, because I didn't lie. I'm not going to lie for you in court." (*Id.*, at 120). Mrs. Spetzer further testified to appellant's statements relating to his desire to have sex with her daughters when he was out on bail. (*Id.*, at 124–25).

Additional communications between husband and wife regarded the taped telephone conversations. Kim Spetzer related details of these conversations, which included discussion of appellant's attempts to arrange a sexual encounter with her daughters at a motel while they went shopping at a mall. (*Id.*, at.143–45). Furthermore, the taped conversations were played for the jury. Since they represented recordings of the actual conversations the entire content represented communications between appellant and his wife. These conversations included numerous discussions in which appellant and Mrs. Spetzer, pretending to go along with appellant, planned the fictitious arrangement to have a sexual encounter with the girls at a hotel.

Having set forth numerous examples of the testimony implicated in appellant's first issue, we now address appellant's challenge

to trial counsel's failure to object to Kim Spetzer's testimony relating confidential communications. This first requires a determination regarding the admissibility of the communications.

■ At common law not only was a spouse incompetent to testify against the other, but a communication between spouses was further deemed confidential and inadmissible at trial. The codified version of this rule in Pennsylvania is found at 42 Pa.C.S.A. § 5914 and states:

> [e]xcept as otherwise provided in this subchapter, in a criminal proceeding neither husband nor wife shall be competent or permitted to testify to confidential communications made by one to the other, unless the privilege is waived upon the trial.

The Commonwealth does not point to any stated exception within "this subchapter" which would work to negate this privilege in the present case. The Commonwealth does contend, however, that the communications in question lose their privileged status by operation of 23 Pa.C.S.A. § 6381(c). This particular section is found within the Child Protective Services Law and states, in relevant part,

> a privilege of confidential communication between husband and wife or between any professional person, . . . shall not constitute grounds for excluding evidence at any proceeding regarding child abuse or the cause of child abuse.

Appellant argues that this section was meant to encompass only proceedings under the Child Protective Services law and not criminal proceedings. The Commonwealth argues that it encompasses all court proceedings involving "child abuse" including criminal prosecutions. We must agree with appellant.

It is notable that the section the Commonwealth relies upon to validate a posture of admissibility is found in an act regarding non-criminal child protection proceedings. As such, and by the very terms of § 5914, it is not found within the same subchapter and would not appear to invalidate the privilege found in that section. Indeed, our Supreme Court stated that "[t]he sole exception to this rule [privileged status of confidential communu-

nications] is that a husband or wife is competent to testify to rebut a defense based upon grounds that attack his or her character or conduct. In such case, the testimony could encompass confidential communications." *Commonwealth v. Hancharik*, 534 Pa. 435, 441–42, 633 A.2d 1074, 1077 (1993). It is also notable that, upon their face, the two sections appear to be hopelessly inconsistent in that the general pronouncements found in both sections cannot be given effect. If the communications are deemed admissible that interpretation would appear at odds with § 5914. Conversely, if the communications are deemed inadmissible then that interpretation would appear to be at odds with 23 § Pa.C.S.A. § 6381.

In determining which section to give effect it cannot escape notice that sections 5913 and 5914 are specifically designed to apply to criminal proceedings whereas § 6381 could arguably apply to a criminal proceeding by virtue of its rather broad wording but is inserted in a law pertaining to non-criminal child abuse matters. It is also conspicuous that the legislature failed to insert any exceptions to the application of § 5914 in the text of that section while it did so in the immediately preceding section. Section 5913, dealing with spousal incompetence to testify against the other spouse, provides several exceptions including one in criminal proceedings "for bodily injury or violence attempted, done or threatened upon the other, or upon the minor children of said husband and wife, or the minor children of either of them, or any minor child in their care or custody, . . ." It is reasonable to conclude from the inclusion of this exception in § 5913 and its absence in § 5914, that the exception was not meant to apply to confidential communications. However, another significant factor in our decision is our Supreme Court's failure to utilize 23 Pa.C.S.A. § 6381 to find confidential communications admissible in *Commonwealth v. Hancharik*, 534 Pa. 435, 633 A.2d 1074 (1993).

In *Hancharik* our Supreme Court considered the husband-wife confidentiality privilege in the context of a child sexual abuse case and found that the wife's testimony of confidential communications between she and

the appellant would have been excludable had appellant's counsel taken the proper steps to object and block the testimony. The court concluded that the provisions of 42 Pa.C.S.A. § 5914 were separate from, and unaffected by, the provisions of § 5913, which, as indicated above, allows a spouse to testify against another in cases involving bodily injury to minor children of either spouse or minor children in their care. Thus, the Court concluded that the husband-wife confidentiality privilege was indeed applicable in a case where the husband was accused of sexually abusing a minor. However, this did not end the inquiry in *Hancharik*. Since *Hancharik* was an ineffectiveness of counsel case, as is the present one, the court needed to inquire whether the failure to object constituted ineffective assistance of counsel.

In analyzing the ineffectiveness issue, the Court did not specifically discuss the applicability of 23 Pa.C.S.A. § 6381 to the facts of *Hancharik*. Thus, direct guidance from our highest court as to the applicability of 23 Pa.C.S.A. § 6381 to the present factual scenario is unavailable. However, we believe that the Court's failure to discuss this issue is significant. Although normally it is difficult to ascribe a positive intent from a failure to act, in the context of the *Hancharik* case we believe it is notable that the court did not call upon § 6381 to conclude that counsel did not render ineffective assistance of counsel. Since there is no ineffectiveness when counsel fails to object to otherwise admissible evidence the court could have ended the ineffectiveness inquiry by simply stating that the communications, despite being confidential between husband and wife, would have been admissible anyway under 23 Pa.C.S.A. § 6381. This interpretation of § 6381, had it been perceived by the Court to be a proper reading of that section, would have provided a simpler conclusion to the ineffectiveness inquiry than the one taken by the court.

Instead of finding the testimony admissible under § 6381, the court, while concluding that the evidence was properly excludable, embarked upon the slippery slope of trial strategy analysis. The Court determined that under the facts presented a reasonable basis for not objecting to the admission of the confidential communications was apparent on the record that could have explained counsel's failure to object. Since trial counsel had not been questioned as to his motives he was deemed to be effective upon the apparent grounds without a determination of his actual reasons. Under this approach the Court did not find counsel ineffective but did leave a rather clear statement that the communications were indeed privileged.

It is possible, of course, that our Supreme Court never even contemplated the applicability of § 6381 when analyzing *Hancharik*. However, in our opinion, given the great level of legal scholarship possessed by our highest court and the fact that they are well versed in the law of this Commonwealth, the Court's failure to discuss this section provides at least some additional weight to the appellant's position that the confidential communication privilege continues to exist in cases like *Hancharik* and the present one.

The Commonwealth attempts to bolster its § 6381 argument by citation to *Commonwealth v. Arnold*, 356 Pa.Super. 343, 514 A.2d 890 (Pa.Super.1986). *Arnold* involved a criminal proceeding and does discuss the predecessor of § 6381, thus allowing the Commonwealth to argue that § 6381 has applicability to criminal cases. Despite *Arnold's* citation to this section we cannot agree that has the effect the Commonwealth suggests.

We cannot speak for the *Arnold* panel and explain why they chose to discuss the section at issue. However, we cannot conclude that the inclusion of a discussion of this section necessitates application of that section to the present case. At issue in *Arnold* were inculpatory disclosures made by a defendant to a CYS worker, not to a spouse. In considering such disclosures we concluded that the statements made by the appellant to a CYS worker did not constitute a privileged communication. We noted that a CYS worker acts as an investigative arm of CYS and, as such, acts on behalf of the Commonwealth. Since a CYS worker is an agent of the Commonwealth, albeit a different branch than the District Attorney's office, it is difficult to assert that a confidential relationship exists or that there would be any kind of privilege

attaching to communications made to a CYS worker. Since the panel concluded that there was no privileged communication in *Arnold*, by implication they did not find that § 6381, or its predecessor, overrode the privilege. Further, as there was no husband-wife privilege in *Arnold* even had the panel concluded that § 6381 applied to that case, it would not have necessarily followed that it would apply here where there is a specific section protecting such communications. Consequently, we do not find *Arnold* instructive to the inquiry before us.

We are aware that a strict application of the husband-wife confidentiality privilege might seem to provide a harsh result at odds with moral sensibilities. Although numerous appealing arguments could be advanced for the provision of policy exceptions to the privilege in question, none are presented in the relevant sections and we are not empowered to carve out exceptions that might serve valid policy considerations. Such a function is reserved for our legislature or, perhaps, our Supreme Court. Further, although the Commonwealth makes an impassioned plea, based in large part upon a common logic or moral appeal, intellectually their arguments fail. Many of the Commonwealth's arguments essentially equate to a complaint that they cannot obtain a conviction on certain offenses unless the communications are admitted and that surely the legislature could not have intended such a scenario. The Commonwealth's argument ignores the fact that the elements of an offense are one matter and issues of proof and evidence are another. They are, in essence, the proverbial "apples and oranges."

Criminal offenses are defined by their elements and the Commonwealth is obligated under the law to prove each element beyond reasonable doubt. Rules of evidence are policy compromises which attempt to fairly weigh competing interests, the desire to have controversies decided upon all the facts and the perceived need to exclude certain evidence from consideration for a variety of purposes, including questions of reliability or policy matters. Undoubtedly the Commonwealth's task of proving a defendant's guilt is made more difficult by the rules of evidence just as it is with regard to laws relating to search and seizure and suppression of evidence. Nevertheless, such rules of evidence exist, as do laws pertaining to search and seizure, because in a free society, and within the context of our criminal justice system, they are deemed to serve and promote interests and policies that are considered rather important. If these rules result in certain offenders going unpunished it is seen as a necessary evil that our society tolerates to promote individual freedom or other goals, such as intimacy in marriage and a sense of security regarding communications to one's spouse.[1] Thus, although we sympathize with the Commonwealth when they contend that exclusion of the communications may make it very difficult if not impossible to successfully prosecute appellant on some of the charges, we cannot allow these arguments to influence our analysis of the law. The Commonwealth presents no authority that suggests statutory, or even common law, rules of evidence should be construed in relation to their probable effect on the ability to prosecute certain offenses and we are unaware of any that supports this thesis.

The Commonwealth also argues that certain of the communications must lose their privileged status because the communications themselves comprise criminal activity. Specifically, the Commonwealth argues that the communications wherein appellant was soliciting Kim Spetzer to help him set up a sexual encounter with his stepdaughters cannot be privileged because the communications are not merely evidence of crime, but they constitute the crime themselves. We are not persuaded by the Commonwealth's plea. As we stated above, elements of offenses and rules of evidence are two separate matters. Section 5914 is a rule of evidence

---

1. In reference to the privilege in question it has been written that "[t]he principle rationale for the privilege is the preservation of marital harmony through the protection of confidential marital communications. The Legislature, after weighing society's interest in protecting intimacy during a marriage against the need for the presentation of evidence at trial, has found the preservation of marital harmony to be more important." Pennsylvania Evidence, § 507, Packel–Poulin, (1987).

and confers privileged status upon marital communications, it makes no exception for communications which are themselves criminal. Additionally, we believe that this position is refuted by *Commonwealth v. Savage*, 695 A.2d 820 (Pa.Super.1997).

In *Savage* we reaffirmed the husband-wife confidentiality privilege in the context of a robbery case perpetrated by a husband and wife team. At trial the wife was permitted to testify against her husband thereby divulging confidential communications relating to the planning and commission of a robbery. On appeal we concluded that the communications were privileged under § 5914 despite the Commonwealth's argument that the privilege should not extend to these communications because they were in furtherance of criminal activity. The Commonwealth argues that *Savage* should not control this case because, as noted above, here the communications are not just in furtherance of criminal activity but are themselves the criminal activity, notably criminal solicitation. The Commonwealth's argument is unconvincing, however, because in *Savage* the communications could easily have been regarded as criminal solicitations as well, or part and parcel of a criminal conspiracy.[2] Thus, the communications at issue in *Savage* were as much "criminal activity" as are the communications here, yet they were deemed to be privileged regardless.

Nonetheless, we do agree with the Commonwealth that some of the "communications" between appellant and Mrs. Spetzer might fall outside the husband-wife confidentiality privilege. Under § 5914 only **"confidential communications"** between spouses are privileged. It has been stated that "[w]hether a communication is to be considered as confidential depends upon its character as well as upon the relation of the parties. It is essential that it should be made in confidence and with the intention that it should not be divulged." *Seitz v. Seitz*, 170 Pa. 71, 32 A. 578 (1895). Although there is little authority expounding upon what is and

what is not a "confidential communication" in *Seitz* the court stated:

> If not made because of the relation of the parties and in the confidence which that relation inspires and which it is the policy of the law to hold inviolate, it is not privileged. Ordinarily it might be inferred that communications made by a husband to his wife were made with the intent and in the confidence mentioned, but the circumstances and the nature of the statement repel such a presumption in this case. The disclosures sought to be made, . . . did not relate to the confession of a penitent husband who had confided to his wife the story of his wrongdoing, but to a boastful and defiant declaration of his misconduct and of his intention to openly persist in his course, accompanied by insolent and brutal taunts.

*Id.*, 170 Pa. at 75, 32 A. at 578.

A marriage is an intimate relationship between spouses deemed to inspire a sharing of thoughts and feelings that would not be shared with virtually anyone else and the belief that these communications will not be further disseminated. The entire privilege in question was designed to keep such communications sacrosanct and to ensure the expectation that they will remain confidential. However, under *Seitz*, it appears that communications which are not made due to the marital relationship and in the confidentiality that a marital relationship inspires will not necessarily enjoy the subject privilege. There the communication in question was a disclosure of an extra-marital affair by a husband to his wife. But the disclosure was not a contriteful disclosure, or even a matter of factual disclosure which, presumably, would have been regarded as privileged, rather it was in the nature of a taunt, the husband was figuratively rubbing his wife's nose in the news of an extramarital affair. Consequently, it was concluded that the communication was not one imbued with the "confidentiality" of a marital relationship.

It is not easy to graft a workable rule of law from the *Seitz* holding, although it ap-

---

**2.** In *Savage* the defendant's wife, while apparently explaining her participation in the robbery, testified that her husband "told me I had to do it. . . . He just told me I had to do it, either that or I had to go kill somebody down on the Square." 695 A.2d at 821.

pears clear that a presumption exists that all communications between husband and wife are "confidential." *See Hancharik*, 534 Pa. at 442–44, 633 A.2d at 1078. Nevertheless, under the authority of *Seitz*, not all spoken words between a husband and wife will enjoy the privilege under consideration here. It would seem that if the nature of the communication is not imbued with an aura of a sharing disclosure precipitated largely due to the closeness spouses share, then arguably it is not privileged. In this context it would seem logical that certain communications which, for all intents and purposes, victimize the spouse could not reasonably be expected to be kept a secret by the victimized spouse nor could they be deemed a sharing of ideas consistent with the intimacy of a marital relation. For example, threats of serious bodily injury or death leveled against a spouse could be deemed admissible because threatening another is not an intimate sharing of ideas nor is it likely to promote additional sharing of ideas. Further, it is neither logical nor reasonable to believe a spouse would or should keep such threats a secret out of a sense of loyalty to the threatening spouse and/or the marital union.[3] Similarly, communications which were instrumental in committing a fraud against one's spouse should not be thought of as communications a spouse would keep secret because the communications were instrumental in the asserting spouse's betrayal of the other similar to the kind found in *Seitz*.

However, the mere fact that the subject of the disclosure is unseemly or socially abhorrent does not necessarily invalidate the confidentiality. The cases discussed above establish that disclosures of prior illegal conduct or admissions of guilt, even an inculpatory statement of committing murder,[4] are imbued with the aura of confidentiality as are complicit communications with one's spouse in furtherance of criminal activity. Thus, the focus of the privilege appears to be upon the nature of the sharing, not the subject matter of the communication.

It would be impossible for us to definitively rule upon each and every communication related by Mrs. Spetzer for admissibility under this standard, in part because the nature of the communications were not always clearly articulated by Mrs. Spetzer and the tenses of the communications were often confused. Undoubtedly upon remand the trial court will be called upon to rule on numerous potentially privileged communications. The following can be utilized as a guide for those rulings.

■ Addressing the various general categories of communications presented in this appeal we conclude that appellant's direct threats to injure or kill his wife do not have the aura of confidentiality which is the hallmark of the privilege. It is difficult to conclude that a threat to injure one's spouse is made consistently with the confidentiality, intimacy and secrecy that a marital relationship inspires. Indeed, a threat of such a serious magnitude is entirely repugnant to the intimacy and confidentiality that a marital union is deemed to inspire.

Also, information conveyed as part of the threat or physical assault, but which is not itself a threat, may be admissible as well since the entire communication has the same threatening aspect or is hopelessly intertwined with the threat or assault. An example of this kind of communication could be found in Mrs. Spetzer's testimony that "He pulled his knife out. He put his knife the tip of the blade up to my throat, pushed it in a little bit and he said I am going to kill you if you don't go over right now and tell them to leave." (N.T., 7/23/96 at 87). In this situation it would not be necessary to sever the words "if you don't go over right now and tell them to leave" from the rest of the statement. Given that appellant had a knife to his wife's throat and threatened to kill her the communication could not be thought of as a communication inspired by the confidence

---

**3.** This is not to suggest that communications, even insulting or disparaging comments, occurring in relatively "normal" marital squabbles and "fights" are to be deemed admissible at trial. Few married couples would want such communications disseminated.

**4.** *See, Commonwealth v. Clark*, 347 Pa.Super. 128, 500 A.2d 440 (Pa.Super.1985), in which statements by a husband to his wife that he believed he had just shot and killed someone were confirmed to be privileged under § 5914.

and intimacy of a marital relationship and since the non-threatening information was intertwined with the threat it takes on the character of a threat as well.

■ For similar reasons we conclude that the direct threats to injure or kill the wife's daughters or other family members lack the aura of confidentiality necessary to gain privileged status. In many cases the parental instinct is so strong that a parent will value the life of a child above their own. Thus, the threat to injure or kill a child should not be expected to be kept silent and it represents as great an affront to the recipient spouse as to be on a par with threats against the spouse or the taunts found in *Seitz*. A similar assessment can be made with respect to threats against a sibling or parent.

■ In contrast, the inculpatory statements or confessions fall within the ambit of the *Clark* decision—unless having a character of personally affronting the spouse and made in such a manner as was found in *Seitz*—as they bear the hallmarks of a sharing made because of and within the confidentiality of a marital relationship.[5] Similarly, the solicitation attempts and the communications designed to get certain witnesses to do or say certain things in order to exculpate appellant, although illegal, anti-social and even sexually perverted, were made because of and within the confidentiality of a marital relationship.[6] As such, these communications retain a privileged status, unless, as illustrated above, they were made within the context of a physical assault or threat of serious bodily injury upon Mrs. Spetzer.[7]

■ The Commonwealth also argues that certain of the communications were not confi-

dential because they were not meant to be kept between appellant and Mrs. Spetzer, or in the case of the letters, appellant had no expectation of privacy. A hallmark of the confidentiality privilege is the intent that the communication not be divulged and the belief that the communication is not being heard (read) by another. *Commonwealth v. May*, 540 Pa. 237, 656 A.2d 1335 (1995). Thus, communications between spouses in the presence of others are not privileged nor are letters where it is known they will be read. *Id.* To the extent some of appellant's communications were meant to be passed on they would not be confidential. However, it would be necessary that appellant had directed Mrs. Spetzer to indicate that the communicated content was coming from him, not merely that appellant had directed Mrs. Spetzer to do something which involved communicating with others. For instance with regard to appellant's communications to Mrs. Spetzer to keep her children and family quiet or to write retraction letters if appellant merely stated "I told you to keep those people quiet" or "I told you to have her write a letter" then, ostensibly, the communication did not lose its confidentiality because there is no indication that appellant intended that the individuals know the directive was coming from him. If, on the other hand, appellant stated "tell them I said they better keep quiet" then the communication was clearly intended to be passed on and attributed to appellant. Thus, by its nature it was not a communication that was confidential between husband and wife.

■ Appellant's letters from prison were addressed to Mrs. Spetzer and their

---

5. Since an expectation of confidentiality is a hallmark of the privilege one could also read the *Clark* decision to mean that one can reasonably expect that his/her spouse will not turn him/her into the authorities when a confession of guilt is made.

6. Further, with respect to the solicitation charges and considering Mrs. Spetzer's statements alone, and not considering that she was working with the police to snare appellant, her apparent complicity in the arrangements is similar to the scenario found in *Savage* for had she not been working with the police her purported involvement would have likewise been criminal.

7. Appellant also correctly contends that the taped conversations between he and his wife, to the extent they represent ".confidential communications," are inadmissible under the dictates of 18 Pa.C.S.A. § 5711. This section of the Wiretapping and Electronic Surveillance Control Act states that "[n]o otherwise privileged communication intercepted in accordance with, or in violation of, this chapter shall lose its privileged character." Therefore, to the extent there were otherwise privileged confidential communications captured on the tapes in question those communications were inadmissible at trial.

two children, Nicholas and Keri, aged approximately two and one years old at the time in question. Since his children were extremely young and not capable of reading them or, in all likelihood even understanding them if read aloud, the communications do not lose their confidentiality by virtue of them being addressed to the children. *May, supra.* However, there is some question as to the confidentiality due to the possibility of the letters being read by prison officials. If the letters were being read by prison officials and appellant was aware of this then the actual text of the letters would not be confidential because he would have no expectation of privacy. *Id.* On the other hand, Mrs. Spetzer testified as to aspects of the letters being in "code" or having meaning only to her and appellant. Her divulgence of these aspects of the letters, even if the letters were being read by prison officials, would violate the privilege because the meaning of these terms would remain confidential even if read by others. Additionally, Mrs. Spetzer indicated that some of the letters, although addressed to her, were actually intended for her daughter B.G. To the extent the letters were intended to be delivered to B.G. they were not confidential communications between husband and wife and therefore enjoy no recognized privilege. Consequently, these letters would be admissible.

◼ Since trial counsel never objected to Mrs. Spetzer's testimony relating the confidential communications and since appellant has leveled a challenge of ineffectiveness of counsel we must address counsel's failure to object and the matter of prejudice. If counsel had a trial strategy reason for not objecting to the confidential communications reasonably designed to advance appellant's defense then there is no ineffective assis-

tance of counsel. *Hancharik, supra.* Likewise, even if there was not a trial strategy reason for counsel's failure to object, ineffective assistance of counsel will be found only where the failure was prejudicial. *Commonwealth v. Edmiston,* 535 Pa. 210, 237, 634 A.2d 1078 (1993). The question of prejudice should be obvious. By virtue of the admission of Mrs. Spetzer's testimony numerous incriminating statements and commentary were presented to the jury which should not have been. According to the Commonwealth's argument this testimony might be the only evidence available to prove some of the crimes charged. Consequently, it cannot be reasonably doubted that failure to object was extremely prejudicial to appellant.[8] As for counsel's reason for failing to object, appellant's trial counsel testified during hearings on post-trial motions that he never objected to Mrs. Spetzer's testimony because he believed the testimony was admissible under § 5913. (N.T. Post Sentence Motions, 2/24/97 p. 90). As was clearly demonstrated above, this assessment was erroneous. As such, the decision not to object was not a conscious choice of trial strategy designed to advance appellant's defense but, instead, legally ineffective assistance of counsel.

## II. Other Allegations of Ineffective Assistance of Counsel

◼ Appellant further contends that counsel was ineffective in failing to object to inadmissible hearsay. We must agree that certain hearsay statements went unobjected to which were clearly prejudicial to appellant. In one instance B.G. was allowed to testify that she told her sister what appellant had been doing to her and her sister said it had happened to her too. (N.T. 7/23/96 p. 37). In another Kim Spetzer was allowed to testi-

---

8. The Commonwealth suggests that there was no prejudice because, given the content of appellant's defense, much of the privileged communication would have become admissible by virtue of § 5915. 42 Pa.C.S.A. § 5915 states: "[I]n any criminal proceeding brought against the husband or wife, if the defendant makes defense at the trial upon any grounds which attacks the character or conduct of his or her spouse, the spouse attacked shall be a competent witness in rebuttal for the Commonwealth." Although not specifically so stated, presumably the attacked spouse can divulge confidential communications when this section is applicable. *See, Hancharik, supra.*

The problem with this argument is that the testimony at issue was entered on direct, not on rebuttal, and as such came in before appellant took the stand. Therefore, not only does that section not apply to Mrs. Spetzer's testimony, it is impossible to determine whether appellant would have testified as he had if Mrs. Spetzer had not divulged the numerous confidences in question in the Commonwealth's case-in-chief.

fy that she learned appellant had been drugging her,[9] (Id., at 72), and also that appellant's military commander had stated to her that appellant was a problem child and he knew appellant had beaten her. (Id., at 167). Trial counsel presented no explanation for failing to object to the above testimony, and we can conceive of none. Consequently, in our opinion, there was ineffective assistance of counsel in failing to object to the statements in question.[10]

### III. Prosecutorial Misconduct

Appellant further contends that the District Attorney's office committed prosecutorial misconduct in failing to turn over a letter received in its office numerous months before trial which had potentially exculpatory contents. The letter's most relevant portion reads as follows:

To the District Attorney:

> In reference to the [B.G.] case, [B.] is telling people she did not tell the truth while on the witness stand, you might want to look into her Mother's past. I was told that while the [G.] family was stationed in West Germany, the mother was involved with someone in the military. When the man wished to break off the relationship, the Mother was not willing. A rape charge was made and during the investigation or trial, the truth came out. The family had to leave Germany quickly. It is interesting how history repeats itself. . . .

The letter then goes on to assert that the [G.] children committed mean acts against their father.

It is well established that the District Attorney's Office has an obligation to turn over any exculpatory.evidence it comes across to the defendant's attorney. Pa.R.Crim.P. 305(B). In keeping with this rule the D.A.'s office should have turned the letter over to appellant's counsel even if it believed the letter as having little practical value. Nevertheless, the letter is unsigned and contains no return address. It is also rather cryptic and, to a large degree, immaterial. Although there is a reference .to B.G. telling people that she was not truthful on the witness stand, the letter does not indicate who was told this. Thus, it is difficult to see how provision of the letter would have advanced the defense in any significant fashion. In any event, since we shall be remanding for a new trial appellant will have the letter at his disposal for retrial.

### IV. Severance

 Appellant also argues that the court erred in not granting his motion to sever trial of the charges. We disagree. Consolidation of charges is a matter entrusted to the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *Commonwealth v. Lark*, 518 Pa. 290, 543 A.2d 491 (1988). Generally speaking, if evidence of one set of charges would be admissible at trial on the other, and if the defendant will not be unduly prejudiced by a joinder of the charges, then joinder of the charges is allowable and serves judicial economy. In the present case there was a sufficient nexus between the array of charges

---

9. It is not clear how Mrs. Spetzer determined she had been drugged. As such, this testimony was not clearly hearsay. However, there clearly was a basis for objecting and seeking a greater foundation for the testimony, which may have revealed that the basis of Mrs. Spetzer's knowledge was a hearsay statement.

10. Appellant asserts three additional allegations of ineffective assistance of counsel all of which we find meritless. The first argues that counsel should have objected to the prosecutor's argument that travelling to Altoona constituted a substantial step for attempt purposes even though the information did not so allege. However, even if this was erroneous there was plenty of evidence of substantial steps taken to support the attempt charges.

The second asserts that the prosecutor impermissibly questioned Mrs. Spetzer on direct regarding appellant's pre-arrest silence. However, the prosecutor did not specifically ask a question about appellant's pre-arrest silence. Rather, Mrs. Spetzer volunteered this information without any undue prompting.

Lastly, appellant argues that the prosecutor overreached in closing argument and that counsel should have objected. However, since appellant is already receiving a new trial there was no additional harm to appellant resulting from counsel's failure to object. Should the prosecutor attempt to similarly ague on retrial a timely objection could be lodged and the trial court will be presented an opportunity to deal directly with any offending comments.

to allow trial of them together. The evidence relevant to the intimidation of witnesses helped establish a consciousness of guilt while evidence of the continued attempts to have sexual intercourse with his stepdaughters helped to establish his unnatural and ongoing sexual desire/obsession with them. As such, evidence of the second set of charges would be admissible at trial on the first and we find no abuse of discretion in the court's denial of appellant's motion to sever.

### V. Sufficiency of the Evidence

Despite our conclusion that a new trial must be granted we must review appellant's challenges to the sufficiency of the evidence because if the convictions were unsupported by legally sufficient evidence they require reversal and appellant cannot be made to stand trial on them again. Appellant contends that the evidence was insufficient to sustain the various convictions of attempt because he did not take a substantial step toward committing the offenses. Secondly, appellant argues that even if he took a substantial step it was unclear as to what end the substantial step was pointed and therefore the verdict was based upon speculation.

■ In reviewing challenges to the sufficiency of the evidence we must view the evidence in a light favoring the Commonwealth as verdict winner and giving the Commonwealth the benefit of all reasonable inferences to determine if each element of the offenses charged were proven. *Commonwealth v. Eichelberger*, 364 Pa.Super. 425, 528 A.2d 230 (Pa.Super.1987). These convictions must stand even if based upon evidence that may not be available upon retrial. In the present case appellant was charged and convicted of the following attempt charges: four counts to commit rape by forcible compulsion (two counts each 18 Pa.C.S.A. § 3121(1) & (2)); two counts to commit sexual assault (18 Pa.C.S.A. § 3124.1); two counts to commit statutory sexual assault (sexual intercourse with someone under the age of 16 where the accused is more than four years older than the complainant and they are not married)(18 Pa.C.S.A. § 3122.1); two counts to commit involuntary deviate sexual intercourse (18 Pa.C.S.A. § 3123(a)(7)); two

counts to commit indecent assault/non-consensual (18 Pa.C.S.A. § 3126(a)(1)); two counts to commit indecent assault/unmarried—under age 16 (18 Pa.C.S.A. § 3126(8)); two counts to commit corruption of minors (18 Pa.C.S.A. § 6301(a)); two counts to commit aggravated indecent assault/non-consensual (18 Pa.C.S.A. § 3125(1)); and two counts to commit aggravated indecent assault/unmarried—under age 16 (18 Pa.C.S.A. § 3125(8)).

The above charges were based upon appellant's demonstrated willingness to engage in sexual relations with his stepdaughters as evidenced by the intercepted telephone conversations as well as appellant's acts in procuring a hotel room and taking a box of condoms and other sexual paraphernalia to the hotel room.

■ The essential elements of criminal attempt are intent to commit a crime and a substantial step taken toward completion of the offense. 18 Pa.C.S.A. § 901. Appellant contends that he did not take a substantial step towards completion of any crime. We disagree. Appellant believed the planned sexual encounter was underway, made efforts to facilitate the encounter, and went as far as to rent a hotel room and wait with a box of condoms for his stepdaughters to arrive. In our opinion this constitutes a substantial step toward the commission of at least statutory rape, if not more. However, this leads to appellant's second challenge.

■ The attempt charges against appellant fall into two general classifications, the first set involves the intent to have non-consensual sex with the girls or sex through forcible compulsion whereas the second set of attempt charges does not require a showing of a lack of consent or forcible compulsion but does require the showing that the girls were under the age of sixteen and appellant was more than four years older than they and not married to them. Appellant asserts that the convictions for attempt to commit more than the statutory sexual assault charges are based completely upon speculation. We must agree.

In analyzing this argument it must be kept in mind that the attempt charges require a

specific intent to commit a crime. It must also be kept in mind that the entire array of charges resulted from what was essentially a "sting operation." Mrs. Spetzer and the District Attorney's office essentially "set up" the appellant to believe that the stepchildren were interested in having sex with him and would appear at the appointed hotel room. There was never any intent to actually bring the children to the hotel room and, in fact, the children were completely unaware of the entire episode. Nevertheless, operating under this belief appellant took the steps outlined above which we have already deemed "substantial steps" sufficient to sustain an attempt charge. However, the ruse which was essential to get appellant to take these steps and provide a vehicle for conviction also was instrumental in forming appellant's intent. Appellant was led to believe through the telephone conversations that the stepchildren would willingly come to the hotel room to have sex with him. In fact, when Kim Spetzer asked appellant "But you aren't going to make them do it if they don't want to?" appellant responded "nope." (Tel.Tr.6–11). Thus, there was a lack of evidence that appellant intended to force the children to have sex with him.

The Commonwealth argues that based upon appellant's prior rape of B.G. it was apparent what he intended to do with the children or what he would have done if they didn't comply with his requests. However, this stance ignores what appellant was led to believe. Appellant's intent was based upon the understanding that he had, which was that the children were willing to come to the hotel room and have consensual sex with him. Further, what appellant would have done had the children come and balked at his advances is an entirely academic exercise because the entire episode was a fiction. To hold appellant criminally liable for an attempted rape under this theory would be similar to holding a would-be robber, who was foiled in his attempt, liable for attempted murder if previously he had killed someone in a robbery. It would be based on an assumption of what he might have done if confronted with a situation that never happened. Our situation is one step further attenuated because it does not involve a situation which could have occurred but merely did not, it involves a situation which was never going to occur because the whole scenario existed only in appellant's mind. This is indeed speculation and it cannot support a conviction for criminal attempt.

Based upon the foregoing we believe the evidence was insufficient to support the various convictions for attempt to commit nonconsensual and forcible sex. Those charges are found at counts 5, 6, 7, 8, 13, 15, 19, 20, 21 and 23 of the information and will be reversed. In contrast we conclude that the evidence was sufficient to support the convictions on the various other attempt charges based upon the intent to engage in statutory sexual assaults and consensual sexual relations. Suffice to say, and without going into graphic detail, the intercepted conversations clearly establish that appellant intended that much.

Lastly, and in similar fashion, appellant argues that the evidence was insufficient to support the convictions for solicitation of the various sexual offenses. Appellant contends that his asking of his wife to set up the sexual encounters with her daughters "does not constitute any of the substantive sexually related crimes set forth in counts 25 through 44. In other words, the conduct requested of wife does not constitute the offense of Rape, Statutory Sexual Assault, Involuntary Deviate Sexual Intercourse, Aggravated Indecent Assault, and Indecent Assault." (Appellant's Brief p.p. 43–44). Appellant is correct that he did not request, encourage or order his wife to commit rape or sexual assaults upon her daughters. However, the crime of solicitation encompasses more than requesting another to commit the substantive crime underlying the solicitation charge.

Under the definition of solicitation one is guilty of solicitation if, among other things, he/she requests, commands or encourages another to engage in specific conduct which would establish his or her complicity in the commission of the substantive crime charged. 18 Pa.C.S.A. § 902. Thus, if appellant encouraged or commanded his wife to engage in conduct which would establish her complicity in the commission of the sexual assaults

then he is guilty of solicitation in that regard. Appellant indeed encouraged her to engage in conduct which would have made her an accomplice in the commission of the sexual offenses contemplated had she complied. This included, but was not limited to, asking her daughters if they were interested in having sex with appellant, setting up a place and time for the girls to meet her so she could take them to the hotel and making other arrangements to facilitate the plan. Indeed, as we mentioned earlier had Mrs. Spetzer not been working with the police and voluntary participated to the extent she did she would have been criminally liable as well.

 However, for the reasons discussed above relating to the attempt charges, appellant's culpability for solicitation extends only to those offenses intended or contemplated to be committed. In this respect although there was sufficient evidence to establish that appellant solicited his wife to set up voluntary sexual encounters with her daughters, there was insufficient evidence that appellant "solicited" Mrs. Spetzer's aid in facilitating forcible sexual assaults upon the stepdaughters. As such, we will sustain the convictions for solicitation relating to the non-forcible sexual assault charges and the corruption charges but will reverse the convictions on those charges relating to solicitation to commit forcible sexual assaults.[11] Consequently, we reverse the convictions at counts 27, 28, 29, 30, 35, 36, 37, 39, 41 and 43 of the information. All of these counts were based upon allegations of non-consensual or forcible sexual acts.

### Summary

To summarize, Mrs. Spetzer's testimony, which went without objection, divulged numerous confidential communications between appellant and herself that were privileged under 42 Pa.C.S.A. § 5914. Trial counsel's failure to object to Mrs. Spetzer's testimony constituted ineffective assistance of counsel, which was highly prejudicial to appellant and was without a reasonable trial strategy designed to promote appellant's interests. As such, appellant's conviction must be vacated and a new trial granted.

Additionally, certain of appellant's convictions for attempt and solicitation must be reversed as the evidence was insufficient to support the convictions. The bulk of the evidence relating to these charges, if not all of it, centered upon what was essentially a "sting operation" in which Mrs. Spetzer appeared to acquiesce in her husband's wishes to have a sexual encounter with Mrs. Spetzer's two minor daughters. Although appellant demonstrated a desire and willingness to engage in such a sexual encounter, and even took steps toward that end, there was a lack of evidence that appellant intended to commit forcible sexual assaults. Indeed, for the most part, appellant was led to believe that the daughters were willing to come to the motel room for the purpose of engaging in sexual relations with him. Consequently, the array of charges asserting an attempt to commit, or solicitation to commit, forcible or non-consensual sexual assaults must be reversed.[12]

Judgment of sentence reversed in part, and vacated in part. Remanded for a new trial. Jurisdiction relinquished.

KELLY, J., files a Concurring Statement.

MONTEMURO, J., joins Opinion and the Concurring Statement by KELLY, J.

KELLY, J., concurring:

I wholeheartedly agree with the majority's analysis. However, I am compelled to ex-

---

11. The solicitation charges in question were set forth at counts 25 through 44 of the criminal information and included two counts of corruption of minors; four counts of rape, accomplished through forcible compulsion or threat of force; two counts of statutory sexual assault; two counts of Involuntary Deviate Sexual Intercourse; two counts of sexual assault; four counts of aggravated indecent assault, two of which were non-consensual; and four counts of indecent assault, two of which were non-consensual.

12. For purposes of clarification, the convictions to be reversed are at counts 5, 6, 7, 8, 13, 15, 19, 20, 21, 23, 27, 28, 29, 30 35, 36, 37, 39, 41, and 43 of the information 1996–505.

Given our disposition we do not need to address appellant's assertion of an abuse of sentencing discretion.

press my distaste for the spousal privilege as it applies to situations involving the sexual abuse of a child. Specifically, I find repugnant the application of the spousal privilege where it requires a mother to remain silent concerning her husband's admission that he sexually abused her child whom she entrusted to his care and attention.

The majority thoughtfully states that:

[U]nder the authority of *Seitz*, not all spoken words between a husband and wife will enjoy the privilege under consideration here. It would seem that if the nature of the communication is not imbued with an aura of a sharing disclosure precipitated largely due to the closeness spouses share, then arguably it is not privileged. In this context it would seem logical that certain communications which, for all intents and purposes, victimize the spouse could not reasonably be expected to be kept a secret by the victimized spouse nor could they be deemed a sharing of ideas consistent with the intimacy of a marital relation....

Addressing the various general categories of communications presented in this appeal we conclude that appellant's direct threats to injure or kill his wife do not have the aura of confidentiality which is the hallmark of the privilege. It is difficult to conclude that a threat to injure one's spouse is made consistently with the confidentiality, intimacy and secrecy that a marital relationship inspires. Indeed, a threat of such a serious magnitude is entirely repugnant to the intimacy and confidentiality that a marital union is deemed to inspire....

For similar reasons we conclude that the direct threats to injure or kill the wife's daughters or other family members lack the aura of confidentiality necessary to gain privileged status. In many cases the parental instinct is so strong that a parent will value the life of a child above their own. Thus, the threat to injure or kill a child should not be expected to be kept silent and it represents as great an affront to the recipient spouse as to be on a par with threats against the spouse or the taunts found in *Seitz*....

(Majority opinion at 711–712). Thus, under existing Pennsylvania law, a husband's direct threats to injure or kill his spouse or her children are not privileged, as such communications lack the aura of confidentiality necessary to gain privileged status. On the other hand, a husband's admission to his wife that he has already abused his wife's children is protected by the spousal privilege because such an admission is "a sharing disclosure made due to the closeness of the marital relationship"? Pennsylvania law does not expect a mother to keep quiet about her husband's threats to injure or kill her children, but expects and requires her to be silent concerning her husband's admissions to sexual abuse that he has already inflicted upon her children. Such admissions are not only heinous, they also put the mother on notice that her children are at risk for further abuse. As the majority eloquently states "in many cases the parental instinct is so strong that a parent will value the life of a child above [his or her] own." In my opinion, no parent should be expected to remain silent concerning sexual abuse inflicted upon his or her children especially when the abuse is at the hands of a co-parent. Pennsylvania law, however, holds otherwise. Thus, I am bound to join the majority in granting Appellant a new trial.